FRANK W. BENNETT ET AL V. MRS. ERA LUCILLE HOWARD ET AL.

No. 8071. Decided April 28, 1943.
(170 S. W., 2d Series, 709.)

102

J. Cleo Thompson, of Dallas, and Culbertson, Morgan, Chistopher & Bailey, and M. Ward Bailey, all of Fort Worth, for petitioners.

The Court of Civil Appeals erred in holding that the facts were such that issues were raised which should have gone to the jury on the question of gross negligence. Adams v. Consumers Lignite Co., 138 S. W. 1178; Bonnett v. Galveston H. & S. A. Ry. Co., 89 Texas 72, 33 S. W. 334; Peoples Ice Co. v. Nowling, 16 S. W. (2d) 976.

McFarlane & McFarlane, of Graham, and John D. McComb, of Jacksboro, for respondents.

In answer to petitioner's proposition as set out above. Daugherty v. Wiles, (Com. App.) 207 S. W. 900; Chronister Lumber Co. v. Williams, 28 S. W. (2d) 844.

MR. JUSTICE SHARP delivered the opinion of the Court.

Mrs. Era Lucille Howard, as surviving wife, for herself and two minor daughters for whom she is guardian, brought this suit against Frank W. Bennett and Bennett Oil Corporation, for exemplary damages for the death of her husband, W. E. Howard, who was killed by a gas pressure explosion or blowout in an oil well located in the Bryson oil field in Jack County. Respondents based their right to recover exemplary damages on the ground that petitioners' field superintendent, H. R. Smith, was guilty of gross negligence in instructing Howard to run tubing into an oil well 'under pressure." At the conclusion of respondents' evidence the trial court gave a peremptory instruction for petitioners. The Court of Civil Appeals reversed the judgment of the trial court, and remanded the cause for a new trial, on the ground that the evidence raised an issue of fact whether or not petitioners were guilty of gross negligence that

should have gone to the jury. 165 S. W. (2d) 919. A writ of error was granted.

The controlling question presented is whether or not respondents are entitled to recover exemplary damages for the death of W. E. Howard. The question of actual damages is not here involved, because the deceased was covered by workmen's compensation insurance. Article 8306, Section 5, Vernon's Annotated Civil Statutes; Fort Worth Elevators Co. v. Russell, 123 Texas 128, 70 S. W. (2d) 397.

Respondents alleged, in substance, that petitioners had drilled many wells in the Bryson field, and were familiar with the tremendous gas pressure there, and knew, or should have known, of the danger of running tubing into the Rankin well under pressure, and that their field superintendent, Smith, was guilty of gross negligence in instructing Howard to do so; that petitioners were familiar with the kind and character of equipment necessary to be used when placing tubing in a well under pressure, and that Smith was guilty of gross negligence in furnishing Howard with an old, worn, and rusty Hinterliter head, instead of furnishing equipment that would make it safe to run tubing under pressure. It was further alleged that without such negligence the injury to W. E. Howard would not have occurred.

Howard, the deceased, had worked for petitioners in the Bryson field for about two years prior to his death. Smith, the field superintendent, was in full charge of petitioners' lease where the Rankin well is located, the well in which the explosion occurred. After this well was brought in, Smith instructed Howard to make the necessary preparations to run the tubing into the well "under pressure," and explained everything to him about what to do. Smith was not present at the time of the explosion. Howard was to be in charge of the work. While he and other workmen under his charge were attempting to carry out the superintendent's order, the blowout occurred.

The material facts are taken from the testimony of respondents' witnesses, as follows:

Mrs. Era Lucille Howard testified: "That her husband went to work for the defendants in December, 1937, and that he was employed as farm boss or field boss. He did most every kind of work to be done on the lease. * * * He would sometimes have three or four men under him and sometimes maybe more. There

are lots of wells out there in that area my husband had assisted with. He worked on several different leases."

C. N. Watson testified: "I heard Smith tell Mr. Howard what to do. Mr. Smith said, 'Bill, you get everything ready and drill this well in the morning. * * *' Mr. Smith told Mr. Howard to get everything ready; to get the tubing line strung up; he explained everything thoroughly to Mr. Howard about what to do. * * * Mr. Smith told Mr. Howard in my presence, who he gave the instructions, he said, 'Bill, you blow this well in under pressure.' He (Howard) said, 'We haven't been doing that Mr. Smith,' and he (Smith) said that we would do that one this way because he didn't want any oil in the slush pit. * * * He said that is the way he wanted it done and he intended it done that way; that is, under pressure, he wanted the tubing run in under pressure * * *. We didn't get started to run until 11 o'clock and run tubing until 1 o'clock. I don't think we had pressure enough to blow the tubing out. * * * Mr. Smith said to leave it there under those conditions and run the tubing under pressure; that were his instructions because he didn't want oil in the slush pit; because that would be a fire hazard for oil to be in the slush pit. * * * We could tell the pressure was increasing because every joint that would go in the well the pressure would get greater and there was more noise in the well. It got to blowing up ten or twelve feet every time a joint would go into the well. * * * We got down to 2700 feet and screwed that ring down. * * * Then, we went to work with that ring trying to tighten it some more. * * * We worked it first one way then the other, but it would not go. * * * It is generally known among the oil men about the gas in that (Bryson) field and its pressure. I saw H. R. Smith on the first well Bennett drilled there in 1927 on the Chambers farm; he has been there all this time. * * * On the twenty-three wells I had brought in while working for Perrin and Gillespie I was in charge of bringing them in and in completing them. I did not direct or have any of those twenty-three wells brought in under pressure, such as we did in this Rankin Well No. 1 for Bennett. * * * In running tubing in a well under pressure, of course, it is hazardous, very hazardous, to run tubing under pressure; it has been known to blow it out. If those three-inch valves had been opened on this (Hinterliter) head so the oil and gas could have escaped while we were running this tubing this explosion in which Mr. Howard was killed would not have occurred. We could have gotten the tubing in the well with the valves open and it would not have blown out at all; the oil and gas pressure would have gone out at those side openings where the valves are. When you run tubing into

a well you have to .have pressure to get the oil to come up through it and it will flow through the tubing. * * * I am familiar with this (Hinterliter) head and am familiar with another type of head * * * and how they operate. With the new type of head that is used we could have safely run this tubing in this well under pressure. This one we had was an old-style head. * * * Mr. Howard was only in charge of that Ranklin well when this accident happened. * * * Mr. Howard was directing the work we were doing through Mr. Smith. * * * The top hole pressure in that area would accumulate to say about 800 pounds in the four hours' time we were there. * * * I think they (the Hinterliter heads) are built to stand 2500 to 3000 pounds pressure. This ring and on top would have to stand 3000 pounds of pressure pushing against it from below, yes. * * * Based on my experience in the oil field work I do not see anything defective with the Hinterliter head nothing more than just that the ring didn't fit. Before the explosion occurred we knew there was something gone wrong."

Ralph Henderson testified: "I am familiar with the custom and practice of running tubing in oil wells in the Bryson field. It is not practical to run tubing in a well in that field under pressure. * * * In using this head (Hinterliter) it would be the recognized practice and custom to open the valves up when doing that job (running tubing). Pressure will build up in the well and it is likely to blow out if the valves are closed. * * * I had known Mr. Howard two or three years when this explosion took place. * * * He helped do everyting including drilling, too. He helped put these Hinterliter heads on other wells, yes. I don't suppose this is the first time he ever came into contact with a Hinterliter head."

Harlan Matlock testified: "I have worked in the oil fields four years, and that has been in the Bryson field. I have helped run quite a bit of tubing in wells out in that field. In all wells where I have helped run tubing with a Hinterliter head on it, we always run the tubing with the valves open to let the pressure out. If the valves are kept closed the pressure builds up against the rubber and the ring of the Hinterliter head. * * * I don't recall ever running any tubing in a well while under pressure; we always open the valves up and let a part of the pressure off, anyway. I do not recall running tubing in a well like we were doing in this instance. * * * I didn't notice anything particularly wrong with the head, except it was old, and we always wash and clean them up, unless they are new ones. * * * The ring went in all right. * * * If I had found any of the parts out of order I would have told Mr. Howard about it. It was all right

to the best of my knowledge. They all seemed all right to me. * * * W couldn't turn the ring any more with the wrenches. We knew there was something wrong but we didn't know what it was. * * * It is not a good practice to keep a gauge on the Hinterliter heads when running tubing, because if you should drop a wrench you would break that swedge nipple it is fastened to, or screwed on to. * * * At the time of the explosion we were attempting to tighten this hold down ring on top of the Hinterliter head. We tried to turn it with a bolt, or a piece of iron, but it wouldn't turn. So, then, we used a 36-inch Stillson wrench on each side and we tugged on it and it wouldn't turn, and we thought probably there was a piece of rust in there that was holding it; we knew there was something in there because it wouldn't tighten down. Mr. Howard began tapping with a hammer; he used a hammer there, probably an eight pound hammer; he was tapping on my wrench with this hammer. * * * We were trying to pull on the wrenches enough to get it down when the explosion happened."

Oscar Boase testified: "Matlock and Faulkner had hold of a wrench and Mr. Howard had a sledge hammer and was hammering on the wrench. Just then this explosion came up and it blew Mr. Howard up ten or twelve feet in the air. * * * They had two wrenches on the ring trying to turn it and Mr. Howard had a hammer and he was tapping on the wrench trying to force it more so the ring would turn. He had about a fourteen pound sledge hammer. He was hitting on the handle of one of the pipe wrenches. * * * I heard Mr. Watson say it was too dangerous and he was going to get out of there. Mr. Howard and others were present. They just went on working. * * * The Hinterliter was there when I got there and was cleaned up and in place. * * * I didn't see anything wrong with the equipment being used there. It just blew out. Yes, that was a brand new ring and new rubber; they brought them out that morning. * * * Mr. Howard was over Matlock and all of them; he had full charge of the job. * * * We used the same Hinterliter head, or they did." It is further shown, "That the defendants' field superintendent came out to the well and ordered Howard to run the tubing under pressure, and when a protest was made to the effect that wells were not brought in in that manner in the Bryson field, the superintendent, with an oath, told Howard that was the way 'this well' would be brought in, and that was the way he wanted it done; that he did not want oil run in the slush pits; that such oil would produce a fire hazard."

Since the issue of actual damages is not involved here, because the deceased was covered by workmen's compensation insur-

ance, the question of ordinary negligence is removed from the case. We are therefore confined to the consideration of the question as to whether Smith was guilty of gross negligence in directing the running of the tubing in the oil well under pressure, as was done. There is neither allegation nor proof that petitioners were negligent in employing H. R. Smith, or that he was incompetent and inefficient. On the contrary, the record discloses that he had been in the oil well drilling business a long time, and that he was efficient in his line of employment.

The Court of Civil Appeals held that, based upon the rule announced in Morton Salt Co. v. Wells et al (Civ. App.), 35 S. W. (2d) 454, 458, affirmed by the Supreme Court in 123 Texas 151, 70 S. W. (2d) 409, the testimony raised an issue of gross negligence for determination by the jury, and cited as additional authorities the following cases: Fort Worth Elevators Co. v. Russell, 123 Texas 128, 70 S. W. (2d) 397; Chronister Lumber Co. v. Williams (Civ. App.), 28 S. W. (2d) 844; and People's Ice Co. v. Nowling (Civ. App.), 16 S. W. (2d) 976.

Section 26 of Article 16 of the Texas Constitution reads as follows:

"Every person, corporation, or company, that may commit a homicide, through wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body, or such of them as there may be, without regard to any criminal proceeding that may or may not be had in relation to the homicide."

■ The rule is almost universally recognized that exemplary damages are recoverable for, and only for, such injuries as result from wrongs accompanied by some aggravating circumstances of malice, fraud, gross negligence, etc. 25 C. J. S., Damages, p. 715, sec. 119; 15 Amer. Jur., p. 716, sec. 279.

In 13 Texas Jurisprudence, p. 241, sec. 133, in discussing the general rule relating to exemplary damages, it is said:

"In order that a recovery of exemplary damages may be sustained, the plaintiff must show, not merely that the defendant could have or ought to have foreseen and prevented the loss or injury of which the plaintiff complains, but that he acted intentionally or wilfully, or with a degree of 'gross negligence' which approximates a fixed purpose to bring about the injury of which the plaintiff complains. The mental factor is also described in the reports by the terms 'malice,' 'fraud,' 'oppression,' 'recklessness,' and the like. Regardless of the expression

which is used to describe it, the purpose or intention of the defendant is determinative of his liability for exemplary damages."

In the case of Missouri Pac. Ry. Co. v. Shuford, 72 Texas 165, 10 S. W. 408, Chief Justice Stayton, speaking for this Court, said:

"Gross negligence, to be the ground for exemplary damages, should be that *entire want of care* which would raise the belief that the act or omission complained of was the result of a *conscious indifference* to the rights or welfare of the person or persons to be affected by it. Cotton Press v. Bradley, 52 Texas, 600." (We italicized "conscious indifference.")

Since the cases cited by the Court of Civil Appeals in support of its opinion in this case were rendered, this Court had before it for decision the question of exemplary damages in the case of Texas Pacific Coal & Oil Co. v. Robertson, 125 Texas 4, 79 S. W. (2d) 830, 98 A. L. R. 262. The authorities bearing upon this question were reviewed, and the rule announced by this Court in the Shuford case was reaffirmed. Judge Smedley, writing the opinion for this Court in the Robertson case, in the course of his opinion said:

"It is to be observed that the definition quoted used the words 'conscious indifference,' thus stressing the mental attitude of the person charged to have been grossly negligent. Gross negligence is positive or affirmative, rather than merely passive or negative as ordinary negligence often, and perhaps usually, is. As said in the discussion in Ruling Case Law of the right to recover exemplary damages for gross negligence: 'The rule is that recovery is permitted, in, and confined, to cases where the negligence is wilful, or where it is so gross as to indicate wantonness or malice.' 8 R. C. L., p. 590. Mere indifference is not enough. The indifference must be *conscious*. The indifference is to the rights or welfare of the person or persons who may be affected by the act or omission. Thus the doctrine of forseeableness becomes important.

"The Court of Civil Appeals in Magnolia Petroleum Co. v. Ford, 14 S. W. (2d) 97, rested its decision, that the evidence did not raise the issue of gross negligence, very largely upon the conclusion that the employer could not reasonably have foreseen that the employee would place himself in the particular position in which he was injured. That portion of the opinion of the Court of Civil Appeals in which the finding of no evidence of

gross negligence was made was approved in the refusal of the application for writ of error. Ford v. Magnolia Petroleum Co., 118 Texas 461, 17 S. W. (2d) 36."

This question was again before this Court in the case of Rowan v. Allen, 134 Texas 215, 134 S. W. (2d) 1022, and in an opinion written by Judge Hickman the rule announced in the Shuford and Robertson cases was reiterated. We adhere to the rule announced in the cases above mentioned, and any rule to the contrary announced in other cases, in conflict therewith, is hereby overruled.

For an annotation of the cases in other jurisdictions dealing with this question, we refer to 98 A. L. R., p. 267.

■ Exemplary damages are not allowed as a matter of right, or as compensation. If such damages are allowed, they are considered excess compensation in addition to the actual damages sustained, as punishment for the gross negligence alleged as the basis of the suit. Piper v. Duncan (Civ. App.), 131 S. W. (2d) 397 (writ refused).

■ In order for respondents to recover exemplary damages in this case, it was necessary for them to show affirmatively that the petitioners, acting through their superintendent, Smith, disclosed an "entire want of care" or a "conscious indifference" to the rights of those working under Smith at the time of the explosion. Smith was an experienced oil man, and was superintendent of the drilling in that field; and Howard, an experienced oil field worker, was acting under him at the time of the explosion. It is undisputed that Smith was not present at the time of the explosion, and those working under Howard were running the tubing in the oil well "under pressure." There is nothing in this record to show that Smith disclosed an "entire want of care" or a "conscious indifference" to the rights of the men working on the well at the time of the explosion. It is true that Smith gave the general orders as to how the tubing was to be placed in the well, but as to the details of how the work should be done, these seem to have been left to the judgment of the men.

It is not shown that Smith knew the trouble they were having in putting the tubing in the well, or the method employed by them in tightening the ring on top of the Hinterliter head. It seems that the workmen under Howard tried to turn it with an iron bar, and when that failed they used 36-inch Stillson

wrenches, and, in addition; tapped the wrenches with an eight-pound hammer; and while this was being done the explosion occurred which injured Howard. Smith's judgment in ordering the running of the tubing his way may have been wrong. This alone would not justify a recovery of exemplary damages.

We have carefully examined the testimony of this case, and when tested by the rule which has long prevailed in this State find no basis for a recovery of exemplary damages. Our decision herein makes it unnecessary to consider the other questions presented.

The trial court correctly instructed a verdict for petitioners. Therefore the judgment of the Court of Civil Appeals is reversed, and the judgment of the trial court is affirmed.

Opinion delivered April 28, 1943.