**LANGSTON v. TEX–O–KAN FLOUR MILLS CO.**

No. 11817.

Court of Civil Appeals of Texas. San Antonio.

May 19, 1948.

Rehearing Denied June 9, 1948.

J. M. Burnett, of San Antonio, and Mc-Kay & Avery, of Austin, for appellant.

Carl Wright Johnson, Nat L. Hardy, Calvin E. Mansell, and C. Stanley Banks, all of San Antonio, for appellee.

NORVELL, Justice.·

This is an appeal from a judgment based upon a peremptory instruction. The action was for exemplary damages against Tex-O-Kan Flour Mills Company by Mrs. Alma Belle Langston, widow of O. L. Langston, deceased, upon the theory that the deceased had been killed as a result of gross neglect upon the part of the company. Article 16, § 26, Constitution of Texas, Vernon's Ann. St. The trial Court held that no gross negligence was disclosed by the evidence and hence directed the verdict.

The evidence discloses that, among other mills, the appellee owns and operates the Liberty Mills located at San Antonio, Texas. Langston was an employee of the company at the time of his death on January 5, 1947. His widow was paid the maximum amount provided for by the Workmen's Compensation Law, Vernon's Ann. Civ.St. art. 8306 et seq., and there are no issues of ordinary negligence or actual damages involved in the case.

Langston was killed while attempting to use a man-lift installed in the building occupied by Liberty Mills. This man-lift had been recently repaired or was in the process of being repaired at the time. Appellant contends that these repairs were made in a grossly negligent manner so as to render the use of the man-lift extremely hazardous. It is correctly stated in appellant's brief that "from a time prior to the year 1920 there has been installed and in use in the mill building at Liberty Mills, in San Antonio, Texas, a belt type man-lift. This lift, of a type generally used in milling and elevator plants, automobile storage garages and some types of factories, is a passenger elevator for the use of appellee's employees in carrying out their duties on the various six floors of the mill building. The man-lift consists of a belt moving or traveling over a pulley on the top floor, with a guide pulley in the basement, the belt having steps attached to it at intervals (with hand-holds above the steps) and with a source of power to cause the belt to travel. The belt moves through wells cut through the various floor levels, permitting the passage of the belt and of persons riding on the belt on either the ascending or descending sides thereof. To the main pulley, on the top, or sixth floor, there was connected a shaft which, prior to late December, 1946, rotated by connection with a worm gear which was itself driven by a 5 H. P. (1200 r.p.m.) electric motor connected to the worm gear by flat belts running from the sheave on the motor to a pulley on the input side of the worm gear. Thus, when in operation, the pull of the motor caused the main pulley shaft (and the main pulley) to rotate at a reduced and constant speed, and in a fixed direction, whereby the lift belt was made to move vertically so as to give an ascending and a descending side to the man-lift. The lift is operated so that persons may step on a platform or footstep, grasp a handhold and ride to a desired level on either the 'up' or 'down' side while the lift is in motion."

The conventional worm gear of the man-lift having become worn in December, 1946, W. B. Thrasher, the plant superintendent, and A. O. Dingel, the maintenance foreman, undertook certain repairs. The worm gear was discarded and an American Pulley Company speed reduction unit was obtained and installed. The lift was placed in operation on the morning of January 5, 1947. The American Pulley Company reduction drive had never been used before, and the instructions accompanying the unit directed that one end of a torque arm be bolted to the reduction unit housing box and that the other end of the arm be "bolted to the motor base or any other definite rigid location." The purpose of the torque arm was to hold the housing box in place and prevent the unit from rotating. In the event the reduction unit housing were permitted to rotate the gears thereof would not serve their function to rotate the shaft, and the belt would move freely over the pulley by force of gravity alone.

The torque arm was anchored to a wooden beam by means of lug bolts or screws. These screws gave way and as a result Langston was fatally injured.

On January 5, 1947, the general manager of the Liberty Mills was J. W. McVay. The plant consisted of a number of units in which the business of flour, corn and feed milling, as well as elevator and warehousing operations were carried on. Thrasher was plant superintendent under McVay. Dingel was maintenance foreman under Thrasher, and Langston was the head miller. Thrasher, Dingel and Langston had each been employed by Liberty Mills for over twenty-five years.

For the purposes of this discussion, Thrasher may be considered as a vice-principal. The work of installing the reduction unit in place of the worm gear was done by Dingel under the general direction of Thrasher.

The timber to which the torque arm was fastened was a crossbeam upon which was mounted a part of the mechanism which operated the lift. The beam was four or five feet in length and approximately, but not exactly, square and between seven and eight inches in width and thickness. Two lug bolts or screws were used to fasten the torque arm to the beam. These screws required no female parts and were about three and a half inches in length with a diameter of three-eighths of an inch. They had square heads and were forced or screwed into place with a wrench. The screws were of a type generally used to affix or attach rather heavy appliances or equipment to timbers or beams.

The man-lift had been in operation for about five minutes prior to the time Langston sought to use it. Thrasher and Dingel had made some tests while the machinery was not in motion, by standing on one of the platforms and pushing their weight down on the belt.

Thrasher had ridden the lift down to the third floor where he saw Langston and told him that the belt was running a little fast and to be careful. Thrasher then went down to the second floor where he met Dingel. The two men decided to go up to the sixth floor. Dingel got on the man-lift first, and Thrasher took the next platform. When they passed the third floor, Langston got on the platform immediately below Thrasher. The combined weight of the three men and the consequent pull upon the motor and mechanism caused the lug screws to give way. The reduction unit and its housing were thus permitted to rotate, the gears ceased to function and the lift belt reversed itself causing the elevator platforms to fall with the three men. Dingel managed to get off on the fifth floor and Thrasher on the fourth. Langston was only about two or three feet above the third floor when the belt started reversing. He was unable to save himself and fell three stories to his death.

Appellant's pleadings contain numerous charges of negligence against the appellee, which are carried forward in the brief. Many of the acts alleged, even if negligence be conceded, could not, under the facts, be the proximate cause of Langston's death. For instance, it is charged that the reduction unit installed was an improper device and that a worm gear should have been used. The facts show that Langston's death did not result from a functional deficiency of the reduction unit, but from the fact that the torque arm was not securely fixed so as to prevent the housing from revolving on the shaft.

Under the evidence there is no basis for saying that appellee was grossly negligent in employing Thrasher as plant superintendent or Dingel as maintenance foreman.

Gross negligence, if any there be, must be predicated upon using lug screws instead of bolts with nuts for securing the torque arm, or failure to properly test the device before permitting use thereof, or failure to prevent the same from being used until it had been properly tested and found to be operating in a proper manner.

Appellant has filed an able and detailed brief supporting her position that the evidence is sufficient to support a jury finding of gross negligence. However, we are of the opinion that this appeal is controlled by the recent case of Bennett v. Howard, 141 Tex. 101, 170 S.W.2d 709, in which Associate Justice Sharp reviewed at length the applicable Texas authorities re-

lating to gross negligence and followed Missouri Pac. Ry. Co. v. Shuford, 72 Tex. 165, 10 S.W. 408, 411, in which Chief Justice Stayton said:

"Gross negligence, to be the ground for exemplary damages, should be that *entire want* of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the rights or welfare of the person or persons to be affected by it."

In Bennett v. Howard, Mr. Justice Sharp emphasized the words "conscious indifference" appearing in the above quotation and stated that [141 Tex. 101, 170 S.W.2d 713]: "We adhere to the rule announced in the cases above mentioned (including the Shuford case), and *any rule to the contrary announced in other cases, in conflict therewith, its hereby overruled.*" (Italics ours.)

■ In our opinion, under a view of the evidence most favorable to appellant, it can not be said that Thrasher (or Dingel, for that matter) acted with an "entire want of care" or a "conscious indifference" to the rights of Langston. It rather appears that Dingel, and perhaps Thrasher also, underestimated the stress which would be thrown upon the torque arm when the reduction unit was in operation. This does not amount to gross negligence under the applicable Texas authorities. Nor does their failure to discover the insufficient fastening of the torque arm before injury occurred amount to an action or omission resulting from a "conscious indifference" to Langston's rights.

In addition to the point asserting that the court erred in granting the motion for an instructed verdict, it is urged that the court erred in excluding certain testimony proffered by appellant.

■ The excluded testimony, if considered by us, would have no effect upon our holding that an instructed verdict was proper. It consisted largely of opinion testimony as to the suitability of the reduction unit for use with a man-lift and testimony relating to the general practices of others using man-lifts similar to the one here involved. Much of this evidence relates to matters which had no causal connection with Langston's death, for the reasons heretofore pointed out. The excluded evidence, considered along with that admitted before the jury, is insufficient as a matter of law to support a finding of gross negligence.

■ By her final point, appellant complains of the trial court's action in refusing to allow that part of her petition relating to Workmen's Compensation to be read to the jury. In view of our holding that the peremptory instruction was proper, this point presents no reversible error.

In our opinion, none of appellant's points disclose a reversible error and the judgment appealed from is accordingly affirmed.