**VALENCIA et al. v. WESTERN COM-
PRESS & STORAGE CO.**

No. 2856.

Court of Civil Appeals of Texas.

Eastland.

March 23, 1951.

Rehearing Denied April 13, 1951.

Scarborough, Yates, Scarborough & Black, Abilene, for appellant.

McMahon, Springer & Smart, Abilene, for appellees.

GRISSOM, Chief Justice.

Juanita Valencia, acting for herself and as next friend of her minor children, sued Western Compress & Storage Company for exemplary damages as a result of the death of her husband, T. G. Valencia, which, plaintiffs alleged, was caused by the gross negligence of said corporation. Plaintiffs alleged T. G. Valencia was caught in the defendant's cotton press and killed as a result of the defendant's gross negligence (a) in failing to have a signal system that would warn its employees of movement of the press; (b) in having an operator whose eyesight was not good and whose hearing was impaired; (c) in ordering deceased to work in a position of grave peril without adequate safeguards for his protection. At the close of plaintiffs' evidence the court withdrew the case from the jury and rendered judgment for defendant. Plaintiffs have appealed.

The sole question presented is whether there is any evidence of gross negligence which proximately caused the death of T. G. Valencia for which defendant is liable in exemplary damages. While other evidence will be mentioned, in answering this question we must, of course, view the evidence in the light most favorable to appellants. Stevens v. Karr, 119 Tex. 479, 33 S.W.2d 725; White v. White, 141 Tex. 328, 172 S.W.2d 295.

The evidence shows deceased was an employee of defendant at its cotton compress; that he was the head sewer at the press and ordinarily stood on the north side of a bale of cotton and sewed the head of the bale on that side when it was pressed; that another head sewer stood on the south and there were three employees on the east who tied the bales, and three on the west who shoved metal bands around the bale to those who tied them; that back of T. G. Valencia, to the north, was the lever man, Wendel, who pulled the lever that caused the machinery to press the cotton. There were others, including the witness Pink, whose job was to feed the press, that is, to bring another bale of cotton from the "dinky" to the press while a bale was being compressed. Ramon Valencia, deceased's brother, was one of the three on the west of the press, his station being at the southwest corner. His job was to shove bands to the east side of the press. The brother testified that Wendel, the lever man, was "a little hard of hearing;" that the reason he said the lever man was a little hard of hearing was because he had heard some of the boys "holler" at him when they wanted to say anything to him "before he hears them." He was asked: "Did you ever hear the man whose duty it was to holler 'press'; did you ever hear one of those men holler 'press' and J. W. Wendel fail to hear it?"

He answered: "A. I did, sometime. He didn't move the press until he was sure that they holler at him.

"Q. Was it necessary for this man to holler 'press' maybe two times? A. Yes, sir.

"Q. Before he would hear it? A. Yes, sir."

In other words, Ramon testified that it was sometimes necessary for "Blue, the head tier, who stood about an arm's length from the north head sewer, who was T. G. Valencia, to holler 'press', maybe two times" before Wendel, the lever man, heard him. The procedure was for the lever man to pull the lever that caused the machinery to press the cotton when the head tier, "Blue", gave him the signal that everything was ready by calling, "Press." The head tier, Blue, stood at the northeast corner and T. G. Valencia on the north. Wendel, the lever man, was in a little house to the north of them. "Old Blue" was the man who gave the signals to the lever man. Ramon testified that he heard "Blue" give the signal to the lever man before the lever was moved, permitting the cotton to be

pressed, on the occasion that Valencia got his head crushed in the press. Deceased had worked as head sewer for two years and was acquainted with the press, its situation and operation. There was no change between the time T. G. Valencia went to work and the time he was killed. There was ample light on the press and in the building. The accident occurred at 1:30 o'clock in the afternoon. Ramon testified in substance that he would be closer, standing at his southwest corner of the press, to the lever man than the employees who were feeding the press, among whom was the witness Pink. The lever man stays in a little room a short distance from the press. The room has three big windows. When the lever man is standing in his room he is looking at the cotton, "looking nearly all the way around." He faces south. The head sewer on the north end, T. G. Valencia, ordinarily stood between the lever man and the press. Ramon testified that the lever man could see the head sewer on the north, T. G. Valencia, more clearly than he could any of the other employees. Ramon testified that when his brother was killed he was sewing heads; that when his brother was killed he heard "Blue" call "press."

Pink testified that he saw Valencia killed; that a bale of cotton was broken; that it was too heavy for the press and broke in half and "the end came up"; that T. G. Valencia was straightening the head of the bale "between the bale and the press; straightening the bale in the press and the press went up and killed him"; that Mr. Wendel pulled the lever. Pink testified that it was the custom for the head tier to call "press" to the lever man when the bale was ready to be pressed. He further testified that the head tier would sometimes signal that the bale was ready to be pressed by calling to the lever man, "Hey, Cap."

With reference to whether or not on the occasion when Valencia was killed the signal was given to the lever man, Pink's testimony was to the effect that he did not hear the signal and that he was so situated that he would have heard it if it had been given.

It was agreed that "if J. W. Wendel were present that he would testify, as follows:

"That at the time of the death of T. G. Valencia, that he, J. W. Wendel, was operating the press; that is, he was lever man and pulled the lever to operate the press and that he usually got his signal to pull the lever from the head tier; that this was the only signal given for him to operate the press and there were no bells or warning devices other than the head tier calling 'press' to warn the employees that the press was going to move and that the bale was going to be pressed.

"That a bale was broken immediately before the death of Valencia and had to be re-tied.

"That there were no guards of any kind around the press to keep a man from getting into it while it was being operated. That the superintendent, A. L. Stewart was familiar with these conditions.

"That T. G. Valencia's head was crushed in the press.

"That it is dangerous for anyone to be in between the press at the time of operations."

Appellants say that there was evidence (1) that there were no hand rails or safety devices to keep employees from getting in the press; (2) that there were no bells or warning devices, other than the head tier calling "press," to warn employees that the press was about to move; (3 and 4) that Wendel, the lever man, was hard of hearing; (5) that it was dangerous for anyone to be in the press while it was being operated; (6) that the appellee's superintendent was "familiar with these conditions"; (8) that there was no signal given the lever man when he pulled the lever that put the press in motion when Valencia was killed, and (9) that sometimes Wendel would "come out of the hole" without the head tier calling him.

Appellants argue in this connection that it is undisputed that the compress that killed Valencia was a "dangerous" machine; that (1) and (2) above were established by the undisputed evidence; that there was

evidence that the signal customarily given was insufficient to adequately protect employees who worked around the press; that the use of such system was negligence, unless appellee also provided the employees with hand rails or safety devices to keep them from getting into the press at the wrong time; that it would be a simple matter for the Compress to install a system of bells, buzzers or flashing lights to warn employees that the press was about to move and that it was undisputed that there were no such devices used; that a bale had broken and it, therefore, became necessary for T. G. Valencia to re-sew the bale; that while Valencia was re-sewing the bale the lever man started the press and killed him; that there was evidence the head tier did not give the signal for the cotton to be pressed. Appellants argue that the lever man failed to hear the signal on the occasion when Valencia was killed and that on previous occasions he had moved the press when the signal had not been called. However, in the same connection, appellants argue that if the head tier, Blue, had given the signal, it would have been possible for Valencia to get out of the way but the signal was not given; that the lever man's hearing was defective and he started the press because he thought it was time to do so. Appellants contend that if the lever man could see he should have seen the deceased in the press sewing the bale; that the evidence showed there was ample light and the lever man was in a position to have seen him if he could see, if he were looking. Appellants insist that there is evidence that appellee retained Wendel in its employment, although he was hard of hearing and "must have had poor eye sight as well" and that in retaining him, appellee was guilty of gross negligence.

In determining whether there is evidence of any of the three grounds of negligence alleged which required that issues relative thereto be submitted to the jury, we must look only to the evidence favorable to appellants and determine whether an issue of fact was raised as to any of them, an answer to which would support a holding that defendant was guilty of gross negligence and liable for exemplary damages.

There was evidence of the following: That Valencia had his head crushed while straightening a bale of cotton that had been broken. It may be inferred that he did not have his body between the bale and press but that he was leaning over with his head inside the press. That, without the usual signal, that is, without waiting for the head tier to call "press," the lever man set the press in motion and caused Valencia's death. The lever man was not shown to be other than a mere servant of appellee and defendant was not liable in exemplary damages for his said negligence. Our Supreme Court, in King v. McGuff, Tex.Sup., 234 S.W.2d 403, 405, opinion by Judge Garwood, quoted the following from Restatement, Torts, Sec. 909, as being the law applicable to a like situation:

"Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,

"(a) the principal authorized the doing and the manner of the act, or

"(b) the agent was unfit and the principal was reckless in employing him, or

"(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or

"(d) the employer or a manager of the employer ratified or approved the act."

There is no evidence which brings this case within any of the exceptions stated above unless it is (b). Appellants alleged appellee was guilty of gross negligence "in having an operator whose eye sight was not good and whose hearing was impaired." There is no evidence that the lever man's eye sight was not good. There is some evidence that his hearing was impaired, that is, that sometimes the head tier would have to call "press" to him twice before the lever man heard the call and started the press. However, as we understand appellants, they contend the lever man was negligent in starting the press without the signal being given. If so, his deafness was not a proximate cause. But, regardless of this, there was no evidence that the lever man was deaf when

he was employed, how long he had been in that condition nor that the superintendent knew of his condition, therefore, exception (b) is not applicable.

■ The agreement as to what Wendel would have testified contains a stipulation that appellee's superintendent "was familiar with these conditions." This means only that the superintendent knew that Wendel operated the lever; that he usually got his signal to pull the lever from the head tier; that this was the only signal given him to operate the press and to warn the employees the press was about to move and that there were no guards around the press to keep employees out. We hold that these things do not constitute gross negligence for which appellee is liable in exemplary damages.

■ Relative to allegation (a), that appellee was guilty of gross negligence in failing to have a bell, buzzer or lights to warn employees of movement of the press, there was no evidence that such a system was commonly used in the industry. The system used shows some care was exercised. See Gill v. Minter, Tex.Civ.App., 233 S.W.2d 585.

■ Failure to have other or different warnings was, at most, ordinary, passive negligence. In Texas Pacific Coal & Oil Co. v. Robertson, 125 Tex. 4, 79 S.W.2d 830, 831, 98 A.L.R. 262, opinion by Judge Smedley, our Supreme Court held that gross negligence was positive or affirmative. "It is to be observed that the definition quoted uses the words 'conscious indifference,' thus stressing the mental attitude of the person charged to have been grossly negligent. Gross negligence is positive or affirmative, rather than merely passive or negative as ordinary negligence often, and perhaps usually, is. As said in the discussion in Ruling Case Law of the right to recover exemplary damages for gross negligence: 'The rule is that recovery is permitted in, and confined to, cases where the negligence is wilful, or where it is so gross as to indicate wantonness or malice.' 8 R.C.L., p. 590. Mere indifference is not enough. The indifference must be conscious."

Gross negligence was defined by Judge Stayton in Missouri Pacific Ry. Co. v. Shuford, 72 Tex. 165, 10 S.W. 408, 411, as follows: "Gross negligence, to be the ground for exemplary damages, should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it."

Judge Sharp, in Bennett v. Howard, 141 Tex. 101, 170 S.W.2d 709, 712, 713, quoted the foregoing. He added, "We adhere to the rule announced in the cases above mentioned (being the Shuford and Robertson cases, supra, plus Magnolia Petroleum Co. v. Ford, Tex.Civ.App., 14 S.W.2d 97), and any rule to the contrary announced in other cases, in conflict therewith, is hereby overruled."

■ The opinion in Bennett v. Howard, supra, is particularly applicable to appellants' contention (c) that appellee was guilty of gross negligence "in ordering deceased to work in a position of grave peril without adequate safeguards". The court said:

"In order for respondents to recover exemplary damages in this case, it was necessary for them to show affirmatively that the petitioners, acting through their superintendent, Smith, disclosed an 'entire want of care' or a 'conscious indifference' to the rights of those working under Smith at the time of the explosion. Smith was an experienced oil man, and was superintendent of the drilling in that field; and Howard, an experienced oil field worker, was acting under him at the time of the explosion. It is undisputed that Smith was not present at the time of the explosion, and those working under Howard were running the tubing in the oil well 'under pressure.' There is nothing in this record to show that Smith disclosed an 'entire want of care' or a 'conscious indifference' to the rights of the men working on the well at the time of the explosion. It is true that Smith gave the general orders as to how the tubing was to be placed in the well, but as to the details of how the work should be done, these seem to have been left to the judgment of the men.

"It is not shown that Smith knew the trouble they were having in putting the tubing in the well, or the method employed by them in tightening the ring on top of the Hinterliter head. It seems that the workmen under Howard tried to turn it with an iron bar, and when that failed they used 36-inch Stillson wrenches, and, in addition, tapped the wrenches with an eight-pound hammer; and while this was being done the explosion occurred which injured Howard. Smith's judgment in ordering the running of the tubing his way may have been wrong. This alone would not justify a recovery of exemplary damages.

"We have carefully examined the testimony of this case, and when tested by the rule which has long prevailed in this State find no basis for a recovery of exemplary damages."

We have carefully studied the cases cited by appellants and the record and have concluded that there is no evidence of the gross negligence alleged for which appellee could be held liable for exemplary damages. See 13 Tex.Jur. 241; 65 C.J.S., Negligence, § 8, p. 371, et seq., and Nichols v. Texas Electric Service Co., Tex.Civ.App., 206 S.W.2d 860.

The judgment is affirmed.