Mildred **WOOLEY**, a widow, individually and as Guardian of Samuel Albert Wooley and Mary Jane Wooley, Appellant,

v.

**SOUTHWESTERN PORTLAND CEMENT COMPANY**, Appellee.

No. 17728.

United States Court of Appeals
Fifth Circuit.

Dec. 17, 1959.

Rehearing Denied Feb. 18, 1960.

John J. Watts, Odessa, Tex., James E. Irion, El Paso, Tex., Thomas A. Sneed, Odessa, Tex., for appellant.

Eugene T. Edwards, El Paso, Tex., for appellee.

Before CAMERON, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The Texas Constitution guarantees a right of action for the recovery of exemplary damages against "every person,

corporation, or company, that may commit a homicide, through wilful act, or omission, or gross neglect \* \* \*." Texas Const. Art. 16, § 26, Vernon's Ann. St. In the face of this, the Texas Workmen's Compensation Act, which otherwise marks the exclusive liability of an employer for industrial injuries, takes cognizance of this constitutionally protected right. Tex.Civ.Stat. art. 8306, § 5 (Vernon 1956). This case presents such an action. After a jury verdict for the surviving widow and children of the deceased employee, Patrick Wooley, the Court by j.n.o.v., F.R.Civ.P. 50, 28 U.S.C.A., entered judgment in favor of the employer, Southwestern Portland Cement Company.

█ Broadly speaking, Texas attaches great significance to two factors which come into sharper focus when, as is so often true, the employer-defendant is a corporation. The first relates to the *quality* of the act of omission or commission. The second concerns the *status* of the actor. The importance of the latter comes from the limitation, in the Texas view, that a corporation only be punished as a public example if it, in a corporate institutional sense, and not mere imputation, was guilty of the acts. Unless expressly authorized or subsequently ratified when the acts are those of mere agents, this requires that the actors be those who stand in relation to the corporation as vice principals. Fort Worth Elevators Co. v. Russell, 1934, 123 Tex. 128, 70 S.W.2d 397.

While this case finally turns on the first factor concerning the *quality* of the acts, the second has special significance although not in the usual way. Ordinarily the question of status of the actor is relevant to determine whether the corporation, as such, has done the acts. Here there is no such problem for no real point is made that the safety engineer under the circumstances here present was not a vice principal. Rather it is important here because Wooley, the decedent, was a vice principal with respect to the very operations giving rise to the fatal burns. And it is his status

as vice principal which becomes relevant in evaluating the *quality* of the acts claimed to have been grossly negligent toward him.

Patrick Wooley was a young man 37 years of age, of fine education and much industrial promise. After graduation as an electrical engineer, he joined the Employer and began a series of jobs of increasing responsibility and considered by the Employer as in-service training looking ultimately toward positions of substantial management responsibility. At the time of his fatal burns, he was, and had been for the past five years of his six and one-half years of service, kiln foreman over the four kilns of the plant. He was immediately in charge of the operation of the kilns, and could stop or start or interrupt such operation whenever in his judgment this was necessary.

Wooley received his fatal burns when preheated cement dust was blown on him. Though the record is vague and leaves much to be desired in portraying the industrial mechanism involved, this summary will suffice. The cement dust came from a storage bin through a preheating device that raised its temperature to 600 to 800 degrees after which it went into the kiln for heating to a range of 2600–2800 degrees. From time to time the feed pipe leading from the mixing-storage manifold to the kiln, became plugged up. There was a metal access door to such feed line, apparently hinged on one side and dogged on the other. When the feed line became clogged up, the usual way to remedy the situation was to open up the access door and insert into the cement dust material in the feed pipe a metal pipe to which was fastened an air hose connected to an air pressure pump. During this unplugging operation, there had been a number of instances (none as severe as this one) in which pressures, apparently built up from the high temperatures in the preheating device or in the kiln, caused some of the material to "belch" out of the feed pipe through the opened access door. To perform this repair operation, the workers had to stand on a raised platform which was so con-

structed that if the material belched out under some pressure, it would spew onto the platform and the access stairway. Again, while the details are undisclosed, the preheating system had just been in operation for about six months and was described occasionally as experimental.

On the occasion of Wooley's fatal burns, the feed pipe became clogged up as it had in the past. Wooley knew this because he personally directed the two men assigned to him as a repair crew to clear the pipe. The two labor-repairmen proceeded to kiln No. 4 and found the feed pipe clogged up. While one of them was getting ready to determine what to do, the feed pipe, he said, blew out and blew some dust on him causing a burn on one of his arms. On his way down the stairway to the first aid room he met Wooley ascending the stairs. He testified that he warned Wooley "to be careful, that it was dangerous," but considering the language difficulty of this Latin-American witness and his possible interest, the jury could disregard this.

Although, as we have said, the proof is woefully vague, we may assume that the jury could find that the feed pipe had frequently clogged up in the past, and in the process of opening it up, hot cement dust had belched out. More important the jury could find that the belching on this occasion was greater and perhaps occurred without the access door first being opened. On such inferences and the testimony of the safety engineer, called by the plaintiff as an adverse witness, it is urged that gross negligence of the Employer is established as a jury issue from several particulars. As we distill these specific charges from the evidence and argument, they included the claims that the basic design of the apparatus was faulty since it frequently clogged up and belched out hot dust; that the access door was so located that if the feed pipe belched, the dust would fall on the workers on the platform or access stairway; that the access door was insufficient and could be blown open by the pressure of the hot gases; that in view of this asbestos clothing should

have been mandatorily furnished and required and the kiln should have been shut down during unplugging operations.

The safety engineer acknowledged that he knew that gases of sufficient pressure to spew out cement dust were generated and he had never required that the company undertake tests to determine whether the access door (cap) would withstand these expected pressures and still remain closed. No such tests were required by him nor was a change of design recommended or undertaken even though he knew that were the hot cement dust to spew out, it would cause severe injuries to workers in the immediate area.

To assume that these acts were negligent is not sufficient to justify exemplary damages. Those factors bearing upon the *quality* of the acts have been the frequent subject of judicial opinions in Texas. In Bennett v. Howard, 1943, 141 Tex. 101, 107, 170 S.W.2d 709, 712, the Supreme Court of Texas quoted without qualification the summary of this vast body of law found then in 13 Texas Juris., Damages, § 133, and now found with slight changes as § 215 in 13 Tex.Jur., Damages, (Rev.1955). "In order that a recovery of exemplary damages may be sustained, the plaintiff must show, not merely that the defendant could have or ought to have foreseen and prevented the loss or injury of which the plaintiff complains, but that he acted intentionally or willfully, or with a degree of 'gross negligence' which approximates a fixed purpose to bring about the injury of which the plaintiff complains. The mental factor is also described in the reports by the terms 'malice,' 'fraud,' 'oppression,' 'recklessness,' and the like. Regardless of the expression which is used to describe it, the purpose or intention of the defendant is determinative of his liability for exemplary damages."

Bennett v. Howard, supra, likewise reiterated the rule from Missouri Pac. Ry. Co. v. Shuford, 1888, 72 Tex. 165, 10 S.W. 408, 411. "Gross negligence, to be the ground for exemplary

damages, should be that *entire want of care* which would raise the belief that the act or omission complained of was the result of a *conscious indifference* to the right or welfare of the person or persons to be affected by it." (Emphasis in the original.) And the term "conscious indifference" was amplified in Texas Pac. Coal & Oil Co. v. Robertson, 1935, 125 Tex. 4, 79 S.W.2d 830, 831, 98 A.L.R. 262. "Mere indifference is not enough. The indifference must be *conscious*. The indifference is to the rights or welfare of the person or persons who may be affected by the act or omission. Thus the doctrine of foreseeableness becomes important." (Emphasis in original.)

To these cases may be added the many listed in Helms v. Universal Atlas Cement Co., 5 Cir., 1953, 202 F.2d 421, 423, as well as Union Transports, Inc. v. Braun, Tex.Civ.App.1958, 318 S.W.2d 927, 939; Upham Gas Co. v. Smith, Tex. Civ.App.1952, 247 S.W.2d 133; Gill v. Minter, Tex.Civ.App.1950, 233 S.W.2d 585; Bolton v. Stewart, Tex.Civ.App. 1945, 191 S.W.2d 798; 30B Tex.Jur., Negligence, § 28, at 199–201 (1954 Rev.).

Of course, as our decision in Cagle v. McQueen, 5 Cir., 1952, 200 F.2d 186, illustrates, the statement of the Texas standard in these terms is a composite one so that specific elements are not to be read in isolation from their context.

It is our task to apply this Texas standard. In doing so, we must determine whether the Employer *vis-à-vis* this injured employee, Wooley, was guilty of conscious indifference toward his safety and welfare. We find no basis for the jury to draw any such harsh conclusions. The Employer had an established safety program with frequent safety meetings. Those for supervisory management were attended by Wooley. The strong emphasis on the industrial safety program reflected a concern by the company for the welfare of its employees. But we need not determine the legal significance, as a matter of law, of such a safety program. See J. S. Abercrombie Co. v. Scott, Tex.Civ.App.1954,

267 S.W.2d 206, 211. For here Wooley, as a vice principal with respect to the operations of the kilns, was charged with, and undertook to perform, duties for the safety of employees in that department. It was uncontradicted that he had worked with the West Coast engineers who had designed this new preheating system and it was his obligation to bring to the attention of the local plant superintendent the need for corrective steps. He knew, better than anyone else, of the history of the feed pipe clogging and the belching of hot cement dust as a consequence. There was no showing that with his own immediate knowledge as well as responsibility, he ever made recommendations for changes which were ignored or rejected. While at first this may appear to be a left-handed application of principles of contributory negligence or assumed risk, we do not place it on such grounds. Rather, it is significant here because it demonstrates that the Employer had charged the very person now claiming to be the victim of a conscious indifference to health and welfare, with specific responsibilities and duties for the safety of those in his own department.

■ This has a double significance. First, it establishes that the Employer had taken some substantial steps for the safety of its employees and second, that it was looking to Wooley as the departmental head to carry out its duties with respect to that operation. It can hardly be said, in the light of his experience and training and education, that in looking to Wooley as the person immediately charged with responsibility for the safety of himself and those working in his department, the Employer was consciously indifferent to his welfare and that of his fellow workers. Whatever might have been the Company's legal situation had the person burned been a mere employee rather than the kiln foreman, the continuation of the use of this preheating system was not with conscious indifference to the safety of the foreman Wooley. On the contrary, from his standpoint, far from indicating a callous,

910

almost wanton, unconcern, the record shows that the Employer looked to him for consultation and advice on the proper operation of the machinery, and recommendations to corrective changes needed in its design. Committed to him as well was the choice of operating methods and this included the decision to shut down or the use of asbestos clothing.

Nothing in Morton Salt Co. v. Wells, 1934, 123 Tex. 151, 70 S.W.2d 409, which, with Fort Worth Elevators Co. v. Russell, supra, and Southwestern Gas & Electric Co. v. Stanley, 1934, 123 Tex. 157, 70 S.W.2d 413, comprised the triumvirate opinions by Chief Justice Cureton concerning exemplary damages in Texas calls for a different result. As to it, we may say, as we did in Helms v. Universal Atlas Cement Co., supra, it "is distinguishable on the facts." [202 F.2d 423.]

Affirmed.