Barbara Ann ARMSTRONG, Individually and as Guardian of the Person and Estate of Kendal Neil Armstrong, a Minor, Appellants,

v.

TEXAS POWER AND LIGHT COMPANY et al., Appellees.

No. 190.

Court of Civil Appeals of Texas.

Tyler.

Feb. 24, 1966.

Rehearing Denied March 17, 1966.

State for the death of Morris Neil Armstrong, the husband of Barabara Ann, and the father of Kendall Neil, the Plaintiffs in the trial court and appellants here. The deceased was covered by Workmen's Compensation Insurance which has been paid.

The case was tried to a jury and at the close of the evidence, the Court withdrew the case from the jury and rendered judgment for the defendants on the ground that the evidence wholly failed to raise an issue of gross negligence to be submitted to the jury. From this judgment, the appellants have duly prosecuted this appeal.

The deceased was electrocuted while working with an eight-man crew of Texas Power and Light Company in removing certain steel wire on its line somewhere near Weatherford, Texas, along Farm-to-Market Road No. 920, and replacing the same with a larger wire in order to give its customers better service.

The members of the crew were as follows:

(1) The foreman, Mr. D. M. Myers (or Doris Myers), 53 years old at the time of this accident, a man of 27 years' experience with the Texas Power and Light Company, who is on the scene and in charge of this crew on the morning of June 2, 1960.

(2) A working foreman, Mr. O. W. "Ike" Shields, a man of 14 years' experience in that position with the Texas Power and Light Company with 32 years' experience in the electrical field at the time of the accident in 1960, who is on the scene and at the time of the accident was pulling the old 3-strand steel wire over his left shoulder with leather gloves on his hands. Mr. Shields had been on Mr. Myers' crew as a working foreman for about four to five years.

(3) A truck driver and utility man, Mr. A. F. "Coon" Hunt, who had been on

Wm. Emerson Stone, Jr., Stone & Stone, Jacksonville, Russell M. Baker, as guardian ad litem for Kendal Neil Armstrong, a minor, Dallas, for appellants.

Robert A. Wooldridge, Burford, Ryburn & Ford, Dallas, for appellees.

SELLERS, Justice.

This suit was brought by Barbara Ann Armstrong in her individual capacity and as Guardian of the person and estate of Kendal Neil Armstrong, a minor, against the Texas Power and Light Company and its foreman, D. M. Myers, to recover exemplary damages under the laws of this

Mr. Myers' crew for 14 years, who at the time of the accident was helping Mr. Shields pull on the 3-strand steel wire over his left shoulder wearing leather gloves also.

(4) A Class B lineman, Mr. Ira T. Fuller, who at the time of the accident was northwest of Mr. Myers and north of the inline position of the old 3-strand steel wire midway between poles 6 and 7 east of F. M. 920. Mr. Fuller was holding a running line around the 3-strand steel wire to keep it away from the hot phase.

(5) A Class A lineman, Mr. Morris Neil Armstrong, who was on pole 4 waiting for sufficient slack to be pulled in the 3-strand steel wire so that he could push the wire off of the cross-arm and down the guy wire. This is the lineman whose death is the subject of this action for exemplary damages on gross negligence.

(6) A Class A lineman, Mr. Bennie Swann, who was going south between pole 2 and pole 1 headed for the first pole south of pole 1 to untie the 3-strand steel wire on the pole.

(7) Mr. Gene Ray Roddy, a brother-in-law of Mr. Armstrong, who was employed by the company from February, 1960, to October, 1960, and who was classified as a utility man (or grunt) on Mr. Doris Myers' crew. Mr. Roddy was two spans south of where the accident happened where Morris Neil Armstrong was located on pole 4. He was serving as a grunt for Mr. Bennie Swann.

(8) Mr. Jay Huff, a Class A lineman for 9 years, with 16 years' experience with the company, who had been on Myers' crew for two years, was on pole 1 with rubber gloves on with the 3-strand steel wire in his hands when the accident happened.

The acts of negligence alleged to have occurred are as follows:

(a) In that Myers assumed the responsibility to act as flagman and failed to do so;

(b) In that he failed to delegate a workman to act as flagman;

(c) In that he, after noticing that an automobile was approaching on F. M. 920 in close proximity to the in-line position of poles 5 and 6 voluntarily turned loose the bull line;

(d) Is the same as (c), except that it alleges that he turned it loose prior to notice;

(e) That he sagged the 3-strand steel wire into the travelled portion of F. M. 920;

(f) That he failed to hold a tailboard conference prior to the accident;

(g) That he failed to assign a sufficient number of men to do the removal job with safety;

(h) That he failed to adopt a proper method;

(i) That he failed to supervise the men in his crew prior to the accident.

Certain safety rules of Texas Power and Light Company governing the duties of the employees are as follows:

(1) To hold a tailboard conference where he shall explain the job in general and assign each man his particular part.

(2) To assign a sufficient number of men to do the job safely and the defendant company by its Rule 201(D) holds the foreman responsible for this duty.

(3) To delegate a competent workman to act as flagman when removing wires across public streets or public highways.

(4) To closely supervise the men in his crew at all times rather than engage in the actual work.

(5) To bring about strict compliance with the safety rules and regulations.

(6) For holding a special safety meeting with his crew when about to begin a particularly difficult job, at which meeting the foreman shall discuss all details of the job and shall satisfy himself that all the men involved in the work understand the precautions that must be observed and the procedure which is to be followed.

(7) The entire responsibility of the safety of men engaged in live line work rests with the foreman.

The record discloses that this crew had been engaged on this job several days before the accident that happened to Mr. Armstrong; that they had crossed this Farm-to-Market Road No. 920 several times and on each occasion the foreman had caused a flagman to be stationed on the road to prevent traffic from coming in contact with the wire when it was lowered onto the road as had to be done when removing the old wire.

This accident happened at a crossing on F. M. 920 where the electric line crossed the highway at an angle as shown by Appellants' Exhibit No. 16. Poles 6 and 7 were on the East side of the highway and poles 5, 4, 3 and 2 were on the West side of the highway. On these poles was a wire carrying 7,200 volts of electricity which was energized at all times. The three strands of steel wire had been de-energized and were being removed. The job of removing these steel wires was not regarded as extra hazardous by this experienced crew. The appellee, D. M. Myers, was foreman in charge of this crew. In his absence, however, there was another foreman, Mr. Shields, who was in charge of the crew.

On the morning of this accident, Mr. Myers was late in arriving at the place of work due to the fact that he and another employee brought out a load of crossarms and unloaded them on the job. When Mr. Myers did arrive, Mr. Shields had already assigned the men to their positions on the job and this took Mr. Armstrong to pole 4 where he was to loosen the steel wire from the crossarm and when given the proper signal, was to push the steel wire off of the crossarm down to the ground. When Mr. Myers reached the job, he was advised by Mr. Shields to handle the bull rope. This bull rope was attached to the steel wires over, at, or near pole 7 and its purpose was to keep the steel wire from sagging and was to hold the wires in place until Mr. Shields gave him the word to slacken on the bull rope. At this time, Shields and another employee were down near pole 3 pulling this wire to the south. It was some thirty minutes after Mr. Shields told Mr. Myers to operate the bull rope before he was given the word to slacken the rope. Mr. Myers let the rope out gradually until he got to the end of the rope, then just before he let go of the rope or just after releasing the same, which is not clear from the evidence, Mr. Myers realized that he had not placed a flagman in the road to stop the traffic and he looked up the road and saw a car approaching the point where the wire was then down in the road. Myers says when he saw the car that he made an effort to get to the road in time to stop the car or push the wire down to the ground so the car would go over the same. He was too late, however, and the car struck the wire just above the bumper with such force as to jerk the wire from the hands of Mr. Shields and the other employees who were pulling the wire to the south and causing Mr. Armstrong on pole 4 to come in contact with the 7,200-volt wire which caused his death.

Since the appellants' case is dependent largely upon the evidence of Mr. Myers, we quote the following from his evidence:

"Q All right, when you walked across FM 920, Mr. Myers, you said a minute ago that you did so or you had the intention out there that you would

station some men as flagmen, is that correct?

"A I said I had it in my mind to put some flagmen out there before the wire was let down.

"Q In other words, before you ever handled the rope or responded to any signals from the west side of the road to slack off, or 'start feeding us some, we're ready to pull', that you were going to put some flagmen there, is that correct?

"A I had in my mind to, yes. That was my thought.

" * * *

"Q Now, all those things would have been done while you were waiting over at pole 7, is that correct?

"A Yes.

"Q And during that time, you still intended to designate and delegate a flagman to be on FM 920, is that correct?

"A Yes, it just slipped my mind, I guess.

"Q Are you telling this jury that you intended, all the way from 5, from south of pole 5 over across that road, to pole 7 and east of pole 7 and while that other work was going on back over there west of that road, having that intention all that time and then, it just slipped your mind?

"A Yes, that is right.

" * * *

"Q All right, that's what I want but before you ever let out any slack, in response to the signal, Mr. Myers, you knew that you hadn't delegated anybody to serve as a flagman, didn't you?

"A Well, I assume, yes that I was going to have some flagmen out there.

"Q Well, my question is didn't you know, Mr. Myers, that before you

had ever let out one foot of that line that you had not designated a flagman or flagmen to flag FM 920?

"A I assumed that I had, it just slipped my mind, I don't know, you know how things—just forget, I don't know what was wrong.

" * * *

"Q All right, and isn't it a fact, Mr. Myers, that when you were over there on June 2nd, that you also knew before you ever let out one foot of slack after the signal had been given that there wasn't any man on that crew acting on the north side of that line or the south side of that line as a flagman?

"A I knew there wasn't, yes.

"Q Didn't you know on June 2nd, 1960, that there wasn't a man to the north acting as a flagman and that there wasn't a man on the south of that line acting as a flagman and that you knew *you* that before you ever let one foot of slack off of pole 7, from that bull line?

"A No.

"Q What are you saying to the jury, Mr. Myers?

"A I told you that I assumed I had and forgot about the thing and I don't know what come over my mind or just got away from me, slipped, I don't know.

" * * *

"Q How it (wire) got into that travel portion of FM 920?

"A All right, they were pulling it and when they got to the end of the rope, I looked both ways as far as I could see and didn't see nobody and when I turned it loose—I turned it loose and right then I realized there wasn't a flagman out there, when I turned

that rope loose and I tried to get to the road to hold that wire down on the road.

"* * *

"A Other than when I turned it loose, as I said, I realized I didn't have a flagman out there and that was when I started—

"Q (Interposing) Started, in other words, you started to the road, you tell this jury, when you realized you didn't have a flagman, is that correct?

"A That's right.

"* * *

"A When I turned it loose, I looked back that way and could see it, I saw a car coming, yes. That's when I realized I didn't have a flagman and started. * * * When I saw the car coming I realized I didn't have a flagman and started over.

"* * *

"Q Now, I believe you told this Jury a little while ago that when you were over there by pole 5, when you were on top of that pole, that you had intended to designate and delegate some flagmen, isn't that correct?

"A Yes, sir.

"Q That you had that intention all the way across FM–920 down that ditch and over to pole 7?

"A Yes, sir.

"Q And that you continued to have that intention until such a point as you then forgot about it and realized that you hadn't done it until you had already turned that rope loose, is that correct?

"A That is right.

"* * *

"Q In other words, you were going to watch the cars after you turned it loose, rather than before?

"A After I turned the rope loose, I looked back and saw the car coming and I knew I didn't have a flagman and I started to the road to flag.

"Q Was anything said by either of you, Mr. Myers, with respect to a flagman?

"A No, sir, not that I remember offhand.

"Q All right, what were your intentions at that time and your purpose and design so far as a flagman was concerned before you began actually, this work?

"A Before we started slacking off that rope, I really intended to have a flagman.

"Q Had you always had a flagman when you were on the job on a similar sort of project or work?

"A Yes, sir, to my best knowledge, yes sir, every time that we taken-out.

"Q The rules provided that you were to hire a flagman where you were taking down or stringing wire across a public highway, didn't it?

"A That is correct.

"Q And you intended to follow those rules and to obey them?

"A Yes, sir, I tried to.

"* * *

"Q (Mr. Burford) What was the reason, if you know, Mr. Myers, why you didn't have a flagman?

"A Well, I can't say, something just diverted my mind or got it on something else. It was just—I just can't say why.

"Q Did you intend not to have one or did you intend to have one?

"A I fully intended to have one.

"Q When did you first realize, it came to you that you did not have a flagman there?

"A Well, when I got started slacking that wire off and the end of the rope got to me, all the slack was out of the rope as far as I was concerned, when I turned it loose and looked back, I realized then—when I saw that car coming, I realized we didn't have a flagman.

"Q What did you do, then?

"A Well, I tried to get to the road.

" * * *

"Q And stood there east of pole 7 all that time, and didn't think about what was going on and what was—to start taking place as soon as they were ready to move it out?

"A Somewhere in there it slipped my mind about not having a flagman out there.

" * * * "

There was no tailboard conference held by Mr. Myers on the morning of the accident and the members of the crew were sent out by Mr. Shields and ordered to take up where they left off the day before. It is undisputed in the evidence that Mr. Myers had on each occasion, when removing this wire from over the highway, placed flagmen to stop the traffic. We place no particular importance to the fact that Mr. Myers failed to hold a tailboard conference on the morning of the accident since the crew was doing the same work immediately preceding for several days.

As we view the evidence, this case presents the sole question of: "Can a foreman and his company be held for gross negligence under the law of Texas for the foreman's neglect or forgetfulness to comply with a plain safety rule of the company to place flagmen on the highway to stop traffic when removing wires across highways?"

The Supreme Court, in a recent case, has defined the rule of law governing this character of case for recovery of exemplary damages. Sheffield Division, Armco Steel Corp. v. Jones, Jr., et al., 376 S.W.2d 825. It was there held:

" * * * There is no question here as to the rule of law applicable to cases of this character where exemplary damages are sought. In one of the later expressions by this court, Bennett v. Howard, 141 Tex. 101, 170 S.W.2d 709, we reaffirmed the definition stated in Missouri Pacific Ry. Co. v. Shuford, 72 Tex. 165, 10 S.W. 408, namely that:

'Gross negligence, to be the ground for exemplary damages, should be that *entire want of care* which would raise the belief that the act or omission complained of was the result of a *conscious indifference* to the right or welfare of the person or persons to be affected by it.' (Emphasis added.)

"Additionally the court quoted from 13 Tex.Jur., p. 241, § 133 as follows:

" ' "In order that a recovery of exemplary damages may be sustained, the plaintiff must show, not merely that the defendant could have or ought to have foreseen and prevented the loss or injury of which the plaintiff complains, but that he acted intentionally or wilfully, or with a degree of 'gross negligence' which approximates a fixed purpose to bring about the injury of which the plaintiff complains. The mental factor is also described in the reports by the terms 'malice,' 'fraud,' 'oppression,' 'recklessness,' and the like. Regardless of the expression which is used to describe it, the purpose or

intention of the defendant is determinative of his liability for exemplary damages." ' "

We are of the opinion that the evidence in this case wholly fails to meet the Supreme Court's definition of gross negligence. The Supreme Court has said:

" * * * In order that a recovery of exemplary damages may be sustained, the plaintiff must show, not merely that the defendant could have or ought to have foreseen and prevented the loss or injury of which the plaintiff complains, but that he acted intentionally or wilfully, or with a degree of 'gross negligence' which approximates a fixed purpose to bring out the injury of which the plaintiff complains. * * "

We think the evidence is sufficient to show that Myers should have foreseen and prevented the accident, but we find no evidence that he acted intentionally or wilfully with a fixed purpose to bring about the accident of which appellants complain.

Our holding is supported by the case of Culter v. Gulf States Utilities Company, Tex.Civ.App., 361 S.W.2d 221, where the facts are very similar to the case under consideration, and the Beaumont Court of Civil Appeals denied recovery, and the Supreme Court denied a writ of error.

Appellants stress the case of Bernal et ux v. Seitt et al, 158 Tex. 521, 313 S.W.2d 520, as supporting their contention, and we have reviewed this case and find that it involves gross negligence under the Guest Statute and is distinguished in the Sheffield case, supra, from our fact situation and we forego a further discussion of the Guest Statute here.

The conclusions reached render unnecessary a discussion of the question of contributory negligence.

The judgment of the trial court is affirmed.