**LOYD ELECTRIC COMPANY, Inc.,**
**Appellant,**

v.

**Maria Leonor C. DeHOYOS et al., Appellees.**

**No. 14536.**

Court of Civil Appeals of Texas.

San Antonio.

Dec. 14, 1966.

Rehearing Denied Dec. 30, 1966.

Groce, Hebdon, Fahey & Smith, San Antonio, for appellant.

Putman & Putman, Richard G. Strong, San Antonio, for appellees.

BARROW, Justice.

This is a suit to recover exemplary damages for the death of an employee, as authorized by Art. 16, § 26 of the Texas Constitution, Vernon's Ann.St., and Art. 8306, § 5, Vernon's Ann.Civ.St. On August 24, 1962, Gabriel C. DeHoyos received fatal burns in a fire which occurred on the premises of his employer, Loyd Electric Company, Inc. Appellees, who are his widow and two surviving minor children, were paid death benefits under the Texas Workmen's Compensation Act. The jury found in a subsequent suit brought by appellee, that appellant company was guilty of several acts of gross negligence [1] which

---

1. I. The jury found defendant guilty of gross negligence as follows:

Defendant, acting through its officers or managerial employees

1. Kept combustible liquids upon the upper floor of its building in such a manner that such substances were in danger of taking and communicating fire.

4. Kept inflammable fluids in places upon the upper floor of its building where ignition and burning obstructed and rendered hazardous egress from the building.

7. Stored or handled Class II inflammable liquids in quantities exceeding ten gallons and Class III inflammable liquids in quantities exceeding 25 gallons in the second floor of its building without having obtained a permit from the Bureau of Fire Prevention of the City of San Antonio.

13. Maintained the fuel pump test tank in such a manner that the test fluid accumulated in the vicinity of electric connectors known by the defendant to emit sparks.

19. Failed to equip the test tank with safety devices to prevent sparks from igniting the test fluid fumes after the previous occurrence of fire.

22. Failed to provide fire extinguishing equipment adequate to immediately extinguish fire in the test stand and attached equipment.

Each of these acts was found by companion issues to be gross negligence and a proximate cause of the death of decedent.

II. In addition, the jury found that defendant was guilty of gross negligence in:

10. Failing to equip the second floor of its building with a fire escape as required by the City Fire Ordinance.

were a proximate cause of DeHoyos' death. Judgment was entered on this verdict whereby appellees recovered exemplary damages against appellant.

Appellant urges there is no evidence, or insufficient evidence, to support the jury's findings of gross negligence so as to justify the award of exemplary damages, and in any event the decedent assumed the risk. Appellant also complains of the exclusion of certain evidence pertaining to decedent's assumption of risk and of the court's refusal to submit issues of ordinary negligence.

The law applicable to a suit for exemplary damages has recently been considered by the Supreme Court in Sheffield Division, Armco Steel Corp. v. Jones, 376 S.W.2d 825 (1964), wherein the following test was approved: "Gross negligence, to be the ground for exemplary damages, should be that *entire want of care* which would raise the belief that the act or omission complained of was the result of a *conscious indifference* to the right or welfare of the person or persons to be affected by it." (Emphases added by Supreme Court.) The Court held that in the absence of wilfulness, wantonness or malice, there must be an entire want of care so as to raise the belief that the acts complained of were the result of a conscious indifference to the rights or welfare of others. See also Armstrong v. Texas Power & Light Co., Tex.Civ.App., 399 S.W.2d 922, wr. ref'd n. r. e.; Whitehead v. Salyer, 346 F.2d 207, 209, Ct. of App. Tenth Cir. (1965).

At the time of the fatal fire, appellant had been working for about eight months on a government contract to overhaul and test aircraft fuel pumps. This work was performed on the second floor of appellant's two-story brick building in the City of San Antonio. The contract required that the pumps be tested in Type I or Type II fuel after their overhaul. The specifications for each type fuel were provided by the contract, and this fuel was purchased by appellant from the Howell Refining Co. The pumps were tested on a test stand which was located in a 10 x 13 foot corner of the second floor and enclosed on three sides by two walls of the building and a concrete wall built by appellant to separate the test stand area from the overhaul area. A panel board containing the controls for the test stand was located at the open end of the test stand area and behind the panel board were stored approximately nine 55-gallon drums of test fuel. Decedent had operated the test stand for about six months prior to the fatal fire.

The test stand was designed by John Loyd, president of appellant, and built by him with the help of a welder by use of controls from a surplus bendix test stand which he secured from Kelly Air Force Base. It consisted of a tank about seven or eight feet long and about 24 inches deep. This tank was mounted about three feet above the floor in such a manner that it could be rotated 180°. The tank was kept about half full of the test fuel, which amounted to about 80 gallons. There were eight openings at the top of the tank and a pump could be inserted in each opening and bolted to the tank for testing. Since the pumps had to be activated electrically, a 28 volt generator was located behind the wall of the test stand area and electricity carried through an aluminum conduit to the control panel and then to leads secured to the ceiling over the test stand. A negative and a positive lead had to be connected to each pump to activate it for the test. Each lead was secured to the pump by means of an alligator clamp.

16. Maintaining the test tank with alligator clips known by it to be improperly insulated.

The jury found that neither of these acts was a proximate cause.

III. Although the jury found that decedent knew there was danger of sparks igniting the fuel collected in one or more of the drip pans, they found he did not fully appreciate the extent of the danger of the fluid catching fire.

When all the pumps to be tested were connected and any unused openings were plugged, the electricity was turned on briefly by the test stand operator to make certain that each pump was operating. The tank was then rotated so that the pumps were on the bottom and submerged in the fuel. The electricity was again turned on to start each pump. If a pump leaked, the operator turned off the electricity to that pump. There was also a switch whereby he could turn off all electricity to the control panel. Three pans, about 4 to 6 inches deep and about 18 x 30 inches wide, were placed beneath the tank to catch any fuel which leaked. Such fuel was emptied by the operator into one of the drums for re-use.

The exact cause of the fatal fire is not known, although it probably started in one of the drip pans. An eye-witness testified that when he first noticed the fire it was in one of the drip pans and decedent was bending over same. Decedent turned around to reach a fire extinguisher on the wall behind him and the flames suddenly enveloped decedent's back and he caught fire. Another employee put out these flames, although he had to use two fire extinguishers because of the failure of the first one. Shortly thereafter two or three of the drums caught fire and exploded. Although there was no direct evidence of how he escaped, decedent apparently jumped from the roof of a shed adjoining the test stand area. Decedent was the only employee injured, although the test stand area was substantially damaged by the fire.

It is obvious from this record that the testing of the pumps was a dangerous procedure. The presence of highly volatile fuels and electricity provide two of the three components necessary for a fire. On two previous occasions a drip pan had caught fire. On each occasion only a small fire occurred in the pan and it was extinguished by use of one of the two fire extinguishers in the test stand area, without property damage or injury to anyone. There is no doubt that appellant violated the City Fire Ordinance in storing the drums of fuel on its premises, however, appellees do not contend that this storage was the cause of the fire or decedent's death.

The thrust of appellees' case relates to the use of the open drip pans and the alligator clamps to secure the electrical leads to the pumps. A chemical engineer testified as an expert witness that the entire operation was very unsafe because of these two facts. The fuels had a flash point of 100° F. and since the temperature was in excess of that on the day of the fatal fire, an electrical spark could ignite the fumes near the fuel in the open pans. This witness testified that a drain system for taking away the fuel as it leaked would have removed much of the hazard, in that although the fumes could still be ignited, there would be little fuel to feed the fire and it would quickly burn out. He further testified that the alligator clamps could become loose with the turning of the tank and could easily cause a spark by becoming grounded or contacting one of the other leads. Two former employees of appellant testified that on prior occasions they had seen electrical sparks. Other types of electrical connections were identified which would be much safer than the clamps. Further, there was evidence that a fire-fighting system could have been installed to flood the test stand area with foam and put out any fire shortly after it started.

This testimony, as well as other of similar import, would fully justify a conclusion that appellant did not use the care that was required to avoid a fire and injury to decedent. On the other hand, the record is uncontradicted that appellant did exercise "some care" to avoid such an incident. Appellees urge that this care, at most, amounted to only a scintilla and is so slight as to demonstrate an entire want of care so as to support a finding of gross negligence within the holding of Morton Salt Co. v. Wells, 123 Tex. 151, 70 S.W.2d 409 (1934).

A similar argument was considered and rejected by the Supreme Court in Sheffield

Division, Armco Steel Corp. v. Jones, supra. It was there pointed out that the Supreme Court in Bennett v. Howard, 141 Tex. 101, 170 S.W.2d 709 (1943), had reversed the Court of Civil Appeals which held that under the *Morton Salt Co.* decision a fact question was raised as to gross negligence, not only when the defendant's negligence "is evidenced by an entire want of care, but even when the exercise of so slight a degree of care as to justify the conclusion that the party was indifferent to the welfare of others." The Supreme Court in *Sheffield Division* said that although it did not construe the opinion in *Morton Salt Co.* as holding that the company was guilty of gross negligence although an entire want of care was not shown, if such were the holding, it was effectively overruled by Bennett v. Howard, supra.

Although the record demonstrates several procedures and other types of equipment that appellant could have used to make the operation safer and place less safety responsibility on the operator, it is our opinion that the evidence fails to meet the requirement that there be an entire want of care. The following demonstrate some of the care exercised by appellant: the test stand area was equipped with two exhaust fans in an effort to remove the fumes from the fuel; the operator was instructed to empty the drip pans to keep fuel from accumulating in same; the alligator clamps were equipped with rubber sleeves and the operator was instructed to make certain that the clamps were secure and the sleeves in place before the electricity was turned on; the electrical system was equipped with a circuit breaker on the panel behind the operator whereby the electricity could be shut off to any pump or to the entire circuit; and two $CO_2$ fire extinguishers were provided in the test stand area which had theretofore prevented fire damage. It is further seen that although the mode of operation had been observed by an inspector from the Department of Defense, an inspector from the Department of Labor, and Fire Department Inspectors from the City

of San Antonio, the only suggestion given for fire safety was that fire lanes be marked on the floor, which was done.

There is no contention that the fire was caused by wilfulness, wantonness or malice on the part of appellant, and since the evidence fails to meet the requirement that there be an entire want of care by appellant, there is no basis for the recovery of punitive damages from it.

The judgment of the trial court is therefore reversed and here rendered that appellees take nothing by this suit.