**FWA DRILLING COMPANY, Inc., a corporation, Appellant,**

v.

**Helen LAMBERT, a widow, Ind., et al., Appellees.**

No. 5818.

Court of Civil Appeals of Texas.

El Paso.

July 26, 1967.

Rehearing Denied Sept. 27, 1967.

Turpin, Smith, Dyer & Hardie, Max N. Osborn, L. Larry Fuller, Midland, for appellant.

W. R. Barnes, Odessa, for appellees.

## OPINION

FRASER, Chief Justice.

This is an appeal from an order of the District Court of Crane County, Texas, overruling appellant's plea of privilege to be sued in Wichita County, Texas, the place of its residence and principal place of business. The trial court sustained appellee's controverting plea alleging venue in Crane County, Texas, under the provisions of subdivisions 9a and 29a of Article 1995, Vernon's Ann Texas Revised Civil Statutes.

This action was brought by appellee asking damages on behalf of herself and four minor children because of the death of her husband, who was killed on December 3, 1963 in Crane County, Texas, while working on an oil well. It appears that appellant had ordered repair work done on a mud pump during the time when a different crew (that is, a different crew from the one of which deceased was a member) was on duty, November 17, 1963. The death of appellee's husband was caused by the blowing up or blowing off of the attachments of the mud pump, one of which apparently struck him in the head. It appears that he survived only a few moments after the accident. Appellant, through its tool pusher and driller, had ordered a welder, who was a co-defendant in this lawsuit, to repair the mud pump, as it had become unusable. There is much conflict as to certain factual matters regarding the au-

thorization and conduct of this repair job, which we will go into later. The record reveals that while the appellee sued both the welder and appellant drilling company, both of whom entered pleas of privilege, only the drilling company appeals from the order overruling the two pleas of privilege. Also, it must be pointed out and kept in mind that appellee states in her brief that she waives her contention under subdivision 29a of Article 1995, T.R.C.S. and relies entirely for support of the lower court's judgment on subdivision 9a of said Article 1995.

As stated, only the drilling company is the appellant here and it claims, under Point 1, that appellee's suit against appellant is one to recover exemplary damages for gross negligence, and subdivision 9a of the venue statute has no application to a suit based upon gross negligence; and under Point 2, appellant claims that the evidence failed to prove conduct on the part of the appellant constituting gross negligence; and under Point 3, appellant urges that there is no evidence to prove that the employees who were involved with the work complained about were corporate officers and vice-principals of the appellant. Point 4 will not be discussed, as it deals with Article 29a of the venue statute, which appellee specifically says in her brief she no longer claims has any applicability to the present controversy.

We believe that the appellant's points of error must be overruled and the decision of the trial court overruling the plea of privilege affirmed. It appears from the record that the deceased was a roughneck working on derricks for the appellant, and that George R. Scott was the evening tower driller in charge of the crew at the time the accident occurred on December 3, 1963, on appellant's Rig No. 9. The deceased was engaged in a process known as jetting the pits, and Mr. Scott saw the pressure on the pump being used to jet the pits suddenly go up and heard a noise at about the same time. He states that he saw the deceased, Robert Lambert, lying on the ground about 20 feet away from the pump, his head badly injured; and, according to Mr. Scott, Mr. Lambert was dead before he was taken away from the rig. Mr. Scott, the driller, examined the mud pump and found that the lines and connections had blown away from the pump and were lying about 30 feet from the pump. He stated that in his opinion some small piece of gravel or something similar had plugged the jet, causing the sudden rise in pressure which resulted in the connections blowing off the pump, striking and killing Lambert. He further stated that plugging of the jet didn't happen very often, but it does happen occasionally. The driller further testified that he had never seen a welding job done like this because, as he said, "You just don't weld to mud pumps because sooner or later it gives away, and any welding done on a mud pump would be merely a temporary measure to get you out of a bind until you can get the pump rebored." Scott stated that the first he knew that a weld had been placed on the mud pump was after the accident, and that if he had known it had been welded, he would have gone ahead and used the pump under the orders of the tool pusher to clean the pits, but that he would not have let any of the men under him get on that side of the pump with the pump in movement. That never before had he seen a steel collar stuck up and welded on the side of a mud pump, and if he had been the driller on tower when the work was done, he wouldn't have repaired the mud pump in that manner because "you just don't do things like that". The collar, nipple, pop-off valve and the high pressure mud line that blew off weighed between 75 and 100 pounds, and it apparently blew approximately 30 feet, hitting Mr. Lambert in the head, splitting his hard hat and inflicting fatal injuries.

The welder testified to various difficulties that he encountered in doing this job, and further testified about the nature of the welding with reference to cast iron. This testimony was apparently elicited because the steel collar was welded to a cast

iron pump. The welder described the proper way for the repairs to be made and, in his opinion, the air chamber of the pump should have been taken to a machinist and then rebored to a larger size, then rethreaded so that a larger nipple could be screwed in, and this is not unusual at all. He testified that when he had finished, that he made out the invoice for the work and took it up to the doghouse to be signed by the driller, the practice being for the company to keep one copy and the welder the other. Mr. Hooper testified that when he gave the invoice to the driller, he told him that the pump was cast (apparently meaning cast iron), and that the weld had checked (meaning that it had cracked) and it wasn't a good weld, and that it should be sent to a pump company or something and repaired properly, and that they would probably have to rebore it and rethread it. He said he does not think he told the driller that it was dangerous, and stated as follows:

"Q   And did you say anything to them at the time of the original weld that that would not work?

A   Yes, sir. When I made out the invoice, I carried it up in the doghouse, finished the, that is, wound my spool up, and I made out the invoice and carried it up inside the doghouse; and when the driller signed the ticket, I told him that the pump was cast and the weld had checked and it wasn't a good weld. It should be sent to a pump company or something and repaired properly, that they would probably have to rebore it and rethread it.

Q   Did you tell him it was dangerous at that time?

A   No, sir, I don't suppose I did. I mean, you assume that it is if there is pressure involved, or I would if someone told me that. I mean, from what I know about it, I would be afraid to work around something

under a bunch of pressure or something, but at the same time it was still on, I assumed good enough that they could use it for an emergency there until they could get it repaired properly.

Q   What was the driller's name?

A   Hipp, I believe."

It is also apparent from the record that all of the parties involved, such as the tool pusher and the driller, had long experience in the oil fields and on oil drilling rigs, and apparently from the above quotation from the record, it is a fair assumption that Mr. Hooper felt that it was not necessary to tell them it was dangerous. Mr. Hooper was then asked if he protested doing the job like that, and he said:

"A   Well now, I didn't actually know what we was into until I had started to weld, and there wasn't anybody around then, and when I saw it check, well, I went ahead and finished that weld, and by then, you couldn't see the checks, and that is the reason I explained to him, you know, that it was cast, it should be fixed because you couldn't just walk up and tell but what it was just as good as it had ever been."

Mr. Hooper further testified that he told the driller that it was a cast material and he would get them out of a bind there temporarily because they couldn't even operate with the pump broken out like it was. He also stated that he told the driller as follows:

"Q   Did you tell him it wouldn't hold under pressure?

A   Yeah, I told him that it was not a good setup there like that.

Q   Did you tell him it was dangerous?

A   Well, I don't recall if I actually used those words. I mean, that was my purpose in warning him, you

know, that there was some danger there.

Q Did you warn anybody besides Hipp?

A No, sir.

Q You felt that it was dangerous?

A Yes sir. A possibility of danger there, yes, sir.

Q That the pressure would blow it off of there and it wouldn't hold?

A And even without so much pressure involved, like I say, the vibration on that stuff is terrific, and would have probably have finally cracked off, you know, from vibration itself.

Q Did you tell Hipp about the vibration part?

A Well, I don't know whether I explained it to him. I just told him that it wasn't a good weld there.

\* \* \* \* \* \*

Q But, you just went ahead and did it?

A To get them out of a bind. They usually request something like that or you wouldn't do it.

Q Did Hipp say they were in a bind, in a hurry, or something like that?

A They had to get it stuck together or something to that effect."

One Francis Lamar Herman was working as a derrick man at the time the weld was done. He was under the control and orders of the driller, named Hipp. Mr. Herman testified that after the weld had been done, the driller instructed this witness to screw the pop-off valve down so that it was set for 2000 pounds pressure, whereas before the welding was done they had been drilling at about only 1400 or 1500 pounds pressure.

We then come to admitted testimony of Mr. Hipp, which was as follows:

"Q Did you ever talk to anybody else connected with FWA above you in a supervisory capacity about having this welding done, either prior to the time it was done or afterwards?

A Well, I asked the pusher about it the morning we had it welded on, did he want to have the welder to weld it on, and he said, 'Get this welder here.'

Q What was that pusher's name?

A Well, the only name I knew him by was Chief Hobbs from up in the Panhandle."

Mr. Hipp further testified that the pusher, Chief Hobbs, told him to get a welder and to weld the collar on, and that he was told by the pusher, Chief Hobbs, to weld the nipple on, and the welder suggested the collar being welded on. It is apparent from this record that in the oil field, the chain of command and responsibility begins with the field or drilling superintendent, then down to the tool pusher, who is in charge of the particular drillers while they are on tower, and that the various derrick men, roughnecks and roustabouts are under the control and authority of the particular driller on duty at each tower.

Chief Hobbs, the tool pusher, testified that if he had been warned that the welding could not be done with safety and that it was dangerous, he would have done something else about it and that the welding was done where the pressure could build up, and if somebody put something on there that wasn't going to hold, a sudden build of air pressure would cause it to blow off; and further, that he depended on the driller. At this point it might be well to mention that there are some conflicts in the testimony, but these, in our opinion, merely produced a factual situation which the trial court obviously decided in favor of the appellees.

We come now to discussion of whether the above facts and testimony are sufficient to constitute what is known as "gross negligence." Gross negligence has been defined as follows: that to establish grounds for exemplary damages, the proponent must show that there existed an entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the persons to be affected by it. Sheffield Division, Armco Steel Corporation v. Jones, Sup., 376 S.W.2d 825 (S.Ct., 1964); Armstrong v. Texas Power and Light Company, Tex. Civ.App., 399 S.W.2d 922 (n. r. e.); Loyd Electric Company v. De Hoyos, Tex.Civ. App., 409 S.W.2d 893.

In the case before us we do not have any indication of wantonness or malice or willful conduct, but we believe the evidence does establish a conscious indifference on the part of appellant for the safety of the deceased. It should be remembered that the steel collar was given to the welder by an employee of the appellant; that the job was ordered done by supervisory employees of the appellant; that the welder testified that he told the driller (who was the man in charge of the rig at the time the welding was done) that it was not a good weld, but only a temporary thing to get them out of a bind and put a useless pump into temporary operation. Further, that the pop-off valve was regulated to accommodate pressure of 2000 pounds, rather than the 1400 or 1500 pounds pressure that had been in use; that Hobbs testified that, as tool pusher, when he was present he was in charge, and that when he was not present the driller was in charge of the drilling rig. Also, that one Doyle Kenneth Lee testified that he was a tool pusher for appellant at the time of the accident, and that the appellant had a drilling superintendent at that time named Leland Jennings. Mr. Lee also testified that in December, he and the members of his crew were drilling a well in Crane County (which was the well in question) and that he had three drillers working under him named James Hipp, George Scott and D. L. Hizer.

In summation, therefore, it is clear and inescapable that there was testimony before the trial court that the welder had discussed this weld, at the very time he finished it, with the driller who was in charge of the rig at the time, and stated that he had only fixed it on a temporary basis. We do not find any evidence in the record that this driller passed on this information given him by the welder, or issued any warning or caution to the other two drillers, or in fact to anyone. The record shows that although the so-called temporary weld was completed on November 17, 1963, appellant continued to use it until December 3, 1963, the day of the accident, without warning any succeeding drillers, or anybody, of the condition or situation existing—to-wit, that the welder felt that it was an inferior weld, and only a temporary repair job, and that the pump should really be taken into a shop and properly repaired. It should be remembered at this point that the driller Scott testified he did not know that there existed this type of weld, and he testified that if he had known that the pump had been so welded that, although he would have used the pump, he would not have let any of the men working under him get on that side of the pump while the pump was in movement. So it was obviously apparent to the trial court that the welder had advised the driller of the condition of the weld—its temporary function; and it further appears that the ticket showing the type of work done was forwarded in to the company office; so the trial court apparently felt that the office, as well as the driller, had notice that the pump had been repaired by a weld. The important thing is that the driller in charge apparently did not act upon the information or warning given him by the welder. All of these facts, as stated and alluded to above, constitute, in our minds, a conscious indifference to the right or welfare of the persons working on this well; for not only was the information apparently passed on to no one by the

driller, but the appellant continued to use the pump from November 17, to December 3rd, when it blew up. Therefore, we hold that gross negligence was satisfactorily established and proven in the trial court.

 As to appellant's point that subdivision 9a of the venue statute does not apply to a suit based upon gross negligence, we hold as a matter of law that it does so apply. It is obvious that the burden of proving gross negligence is much more stringent than proving ordinary negligence, and it would be a strange legislative intent that would permit an exception to the venue statute for ordinary negligence, but exclude the harsher burden of gross negligence. We hold, therefore, that subdivision 9a was intended to, and does, include matters of gross negligence as well as ordinary negligence. Appellant's Point 1 is therefore overruled.

Appellant's Point 2 is also overruled, as it is the point alleging that the evidence failed to prove conduct constituting gross negligence on the part of appellant.

Appellant's Point 3 argues that there was no evidence that the employees who were involved with the work complained about were corporate officers and vice-principals of the appellant. It is obvious from this record that there are many statements in evidence referring to the fact that the driller who was currently on tower was in command of the drilling rig on behalf of the appellant; that supervising the three drillers, one for each tower, was a tool pusher, and above him the drilling superintendent, it is apparent that all of these men exercised and authorized some of the actions and conduct relating to the incident with which we here deal. There is no direct reference, of course, to the drilling superintendent, but the orders did come down from the tool pusher to the drillers, etc. Therefore the other employees at the rig, such as roustabouts, roughnecks or derrick men, were under the care, control and supervision of the driller. We think the record therefore contains ample evi-

dence to substantiate the allegation that the people complained about as having been involved in the accident were representatives of the appellant to the extent that they were corporate officers and/or vice-principals. Appellant's Point 3 is therefore overruled. Chronister Lumber Co. v. Williams, 116 Tex. 207, 288 S.W. 402 (Com.App., op. adopt.)

Appellant's first three points having been overruled, the judgment of the trial court is in all things affirmed.